UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GREGORY G. WILSON; OCTAVIA Y. WILSON;
and TREY G. WILSON,

                              Plaintiffs,

        -v-                                    6:10-CV-72

MICHAEL PEDRICK and the VILLAGE OF
CANAJOHARIE,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

ABDELLA LAW OFFICES                   ROBERT ABDELLA, ESQ.
Attorneys for Plaintiffs
P.O. Box 673
8 West Fulton Street
Gloversville, NY  12078

GOLDBERG, SEGALLA LLP                 LATHA RAGHAVAN, ESQ.
Attorneys for Defendants
8 Southwoods Boulevard
Suite 300
Albany, NY  12211


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I.  INTRODUCTION

        Plaintiffs Gregory Wilson ("Gregory"), Octavia Wilson ("Octavia"), and Trey Wilson

("Trey") commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants

Michael Pedrick ("Pedrick") and the Village of Canajoharie (the "Village") violated their civil

rights.  Specifically, plaintiffs each assert the following Fourth Amendment violations:  (1)

false arrest; (2) malicious prosecution; (3) invasion of privacy; and (4) excessive force.[1]

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure

56.  Dkt. No. 51.[2]  Plaintiffs oppose the motion and seek to have the testimony of a potential

defense expert precluded from trial.  Dkt. No. 57.  The motion was considered on submit.

## II.  FACTUAL BACKGROUND

Unless otherwise noted, the following pertinent facts are undisputed.  Just after

midnight on January 24, 2007, plaintiffs—who are all African American—were traveling in the

Village in a four-door 1995 Pontiac Grand Prix sedan.  Gregory had just picked up Octavia,

his wife, and Trey, his son, from their respective workplaces, and the family was returning to

their home in the Village.  Gregory was driving, Octavia was seated in the front passenger

seat, and Trey was seated in the back seat on the passenger side.  Plaintiffs' car has eleven

separate taillight bulbs aligned in a single row across the entire back of the car, just above

the rear bumper.  See Abdella Aff., Ex. 3, Dkt. No. 57-5.

Pedrick—who is Caucasian—was on-duty as a uniformed Village police officer and

was driving a marked police car.  Shortly after observing plaintiffs' vehicle, Pedrick pulled

behind their car, activated his emergency lights, and executed a traffic stop.  Gregory

promptly pulled to the side of the road, stopping almost directly across the street from

plaintiffs' residence.  Pedrick stopped the vehicle solely because he believed a taillight on the

---

[1]  Plaintiffs also invoke 42 U.S.C. § 1981 in the "Jurisdiction" section of their complaint.  Dkt. No. 1,
¶ 1.  However, plaintiffs do not specifically identify or assert a § 1981 discrimination claim in the complaint or
anywhere else in their pleadings.  In fact, plaintiffs' counsel specifically notes that "[t]he instant lawsuit is
predicated upon causes of action for false arrest, malicious prosecution, excessive force and breach of civil
rights under USC 1983."  Abdella Aff., Dkt. No. 57-1, ¶ 4.  Therefore, the only cognizable claims are those for
false arrest, malicious prosecution, invasion of privacy, and excessive force brought under § 1983.

[2]  Defendants' motion does not specifically challenge plaintiffs' invasion of privacy claims, which
essentially are unlawful seizure claims.  However, because these claims turn on the same legal principles
and factual determinations as plaintiffs' false arrest claims, they too would survive this motion.

driver's side was out, and he did not observe any other possible traffic violations.[3]  Plaintiffs claim Pedrick informed them that he stopped their car because one of the taillights was merely "dim."  Raghavan Aff., Ex. G, Dkt. No. 54-1, 31 ("Gregory Dep. Tr.").  Gregory maintains that he inspected the taillights the following day and found all bulbs to be fully illuminated except for one on the driver's side, which was dimmer than the other ten but not out.

After stopping the vehicle, Pedrick exited his patrol car and approached the driver's side of the car.  Gregory rolled down the rear driver's side window and informed Pedrick that the front driver's side window was inoperable.  Pedrick asked Gregory to open the driver's door.  Gregory complied but only opened the door a few inches wide.  Pedrick requested Gregory's license and registration, which Gregory provided.  Pedrick claims that he smelled a slight odor of alcohol coming from the vehicle, but all plaintiffs deny drinking any alcohol that night.  Pedrick asked where Gregory had been, where he was going, and whether he had consumed any alcohol.  Pedrick alleges—and plaintiffs deny—that Gregory gave evasive and argumentative answers while Octavia and Trey interrupted his questioning, became agitated, and accused him of racial profiling.  Pedrick then asked Octavia and Trey for their names and identification, but they refused to provide such information.  Pedrick returned to his police car, requested back-up assistance, and ran Gregory's license and registration.  The documents proved to be valid, and there were no outstanding warrants for Gregory.  Approximately five minutes later, Pedrick exited his patrol car and approached plaintiffs' vehicle.

---

[3]  Pedrick does not specify which of the eleven bulbs was out and simply maintains that "[t]he taillight was out."  Raghavan Aff., Ex. F, Dkt. No. 53-1, 23 ("Pedrick Dep. Tr. Part 1").

Plaintiffs allege that Pedrick was "shaking" and appeared "nervous," "hyper," "scary," and "frantic" when he returned to the vehicle.  Raghavan Aff., Ex. H, Dkt. No. 55-1, 32–33 ("Octavia Dep. Tr."); Raghavan Aff., Ex. I, Dkt. No. 55-2, 35 ("Trey Dep. Tr.").  Pedrick approached the passenger side of the car and ordered Trey to roll down his window.[4]  Trey rolled the window down but again refused to provide his name or identification.  Pedrick opened the rear passenger side door and pulled Trey out of the car.  Defendants assert that Trey put his hands in his coat pockets[5] and resisted being taken out of the car by extending his leg and bracing his foot on the ground, making it necessary for Pedrick to forcibly pull him from the backseat.  Trey denies resisting and claims that he put his foot on the ground merely to prevent himself from falling as Pedrick forcibly pulled him out of the car.  Pedrick ultimately handcuffed Trey.  At about this time back-up officers began arriving on scene.  Officer Paul Henry of the Fort Plain Police Department took control of Trey and placed him in a patrol car.  Trey remained cooperative with Officer Henry.

Pedrick asserts that Octavia got out of the vehicle, without being told to do so, while he was arresting Trey.  Octavia disputes this and claims that she remained in the car during Trey's arrest.  Octavia further asserts that she exited the vehicle only after Deputy Nicholas Prusky of the Montgomery County Sheriff's Department, who had just arrived on scene, instructed her to "get out of the 'F'-ing car."  Octavia Dep. Tr. at 48.  After Octavia opened her door and stepped out, Pedrick physically struggled with her before she was handcuffed.  Octavia admits to yelling during this struggle but claims Pedrick grabbed her around the waist

---

[4]  Plaintiffs' allege that Pedrick threatened to pepper-spray Trey if he failed to roll down the window.

[5]  Trey denies reaching for his coat pocket, but admits that he was in possession of a box-cutter at the time of his arrest.  There are no allegations that he withdrew the box-cutter from his pocket, and he asserts that he had it in his possession because he had just finished working, where he uses the tool often.

from behind and tried to force her to the ground by placing his leg behind her knee.  As Pedrick was arresting Octavia on the passenger side of the car, Gregory admittedly exited the driver's side.[6]  Gregory asserts that he remained standing near the driver's door and asked the officer "why are you manhandling my wife?"  Gregory Dep. Tr. at 65–66.  Pedrick maintains that Gregory began yelling and walking towards him as he struggled to get Octavia under control.

At about this point several people, including Gregory and Octavia's seven other children, emerged from plaintiffs' house across the street and gathered on the front lawn. Gregory yelled across the street and told the children to call the New York State Police. Pedrick and Deputy Prusky then put Octavia in the back of a police car.  Pedrick claims that Octavia kicked him as he was placing her in the car.  Octavia alleges that she suffered a knee injury during her arrest.  Octavia sought medical treatment for a "contusion" and "pain and tenderness" in her right knee on February 12, 2007.  Abdella Aff., Ex. 1, Dkt. No. 57-2, 1.

Gregory was the last person to be arrested, but it is unclear who handcuffed and placed him in a police car.  Defendants claim Pedrick was still with Octavia when other officers placed Gregory under arrest.  Plaintiffs allege that Pedrick directed Deputy Prusky to make the arrest and assisted handcuffing and escorting Gregory to the police car.

Plaintiffs were all transported to the Village's police station, where Pedrick prepared and signed the paperwork charging all three plaintiffs with obstructing governmental

---

[6]  Defendants are unclear on when Gregory exited the car.  In their Rule 7.1 Statement of Facts, defendants suggest Gregory exited the vehicle while Octavia was being arrested.  See Dkt. No. 51-6, ¶ 26. Pedrick's incident report indicates that Gregory got out of the car earlier, when Pedrick was struggling with Trey.  Raghavan Aff., Ex. D, Dkt. No. 52-4, 4.  In his deposition, Pedrick advised that Gregory remained in the car while he was arresting Trey and only exited when Octavia was being handcuffed.  Raghavan Aff., Ex. F, Dkt. No. 53-2, 22–23, 25 ("Pedrick Dep. Tr. Part 2").

administration and resisting arrest.  Pedrick also issued Gregory a ticket for a defective

taillight.  Gregory and Trey were remanded to the county jail while Octavia was released on

her own recognizance.  Gregory and Trey were released later that day after posting $250 bail

each.  On October 9, 2007, the charges against Octavia and Trey were dismissed "without

prejudice."  Raghavan Aff., Ex. E, Dkt. No. 52-5, 1, 3. Two days later the charges against

Gregory were dismissed "in the interest of justice."  Id. at 2.

## III.  DISCUSSION

Defendants argue that:  (1) the Village cannot be held liable for Pedrick's conduct; (2)

Gregory's false arrest claim must be dismissed because his vehicle's taillight was not working

properly, and Pedrick did not personally arrest Gregory; (3) Octavia's and Trey's false arrest

claims must be dismissed because Pedrick had the authority to order them out of the vehicle

and demand their cooperation; (4) all malicious prosecution claims fail because Pedrick had

probable cause to commence criminal charges against plaintiffs, and the charges were not

dismissed in their favor; (5) all excessive force claims must be dismissed because plaintiffs

were not injured, and minimal force was justifiably used under the circumstances; (6) Pedrick

is entitled to qualified immunity; and (7) plaintiffs are not entitled to punitive damages.

### A.  Motion for Summary Judgment—Legal Standard

The entry of summary judgment is warranted when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548,

2552 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247, 106 S. Ct. 2505, 2509–10 (1986).  A fact is "material" for purposes of this inquiry if

it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4, 106 S. Ct. at 2511 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250, 106 S. Ct. at 2511; Fed. R. Civ. P. 56(e).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. Municipal Liability

Defendants argue that the Village cannot be held liable for Pedrick's conduct that allegedly violated plaintiffs' constitutional rights.

It is well-settled that a municipality cannot be held liable via § 1983 for the acts of its employees under the doctrine of respondeat superior. Cash v. County of Erie, ___ F.3d ___, 2011 WL 3625093, at *6 (2d Cir. 2011). In order to hold a municipality liable under § 1983, a

plaintiff must therefore prove that the constitutional violation was caused by: (1) a municipal policy, (2) a municipal custom or practice, or (3) the decision of a municipal policymaker. Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38 (1978).

Plaintiffs concede that "there is insufficient evidence to prove any history of misconduct on the part of the defendant officer or any policy or custom on the part of the municipality that led to the deprivation of the plaintiffs' constitutional rights." Pls.' Mem. of Law, Dkt. No. 57-7, 13. However, plaintiffs maintain that the "other causes of action" may proceed against the Village under the doctrine of respondeat superior. Id. Plaintiffs fail to realize that they do not assert any claims other than those brought under § 1983. As noted above, plaintiffs' counsel explains that "[t]he instant lawsuit is predicated upon causes of action for false arrest, malicious prosecution, excessive force and breach of civil rights under USC 1983." Abdella Aff., Dkt. No. 57-1, ¶ 4. There are no pendent state tort claims asserted in the complaint.

Accordingly, the defendant Village will be dismissed.

## C. **False Arrest Claims**

Plaintiffs each bring a false arrest claim. Defendants assert that these claims must be dismissed because Pedrick had probable cause to arrest plaintiffs. Defendants also argue that Pedrick was not personally involved in Gregory's arrest.

The elements of a § 1983 claim for false arrest "are substantially the same as the elements of a false arrest claim under New York law." Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citation omitted); see also DeMeo v. Kean, 754 F. Supp. 2d 435, 443 (N.D.N.Y. 2010). Under New York law, the elements of a false arrest claim are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was

conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Singer, 63 F.3d at 118 (internal quotation marks omitted). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . ." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks omitted).

Where, as here, "an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010). Probable cause to arrest exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. The existence of probable cause is an objective inquiry that "is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006). An arrest is lawful as long as there exists sufficient information "to provide probable cause to believe that the person arrested has committed any crime." Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007).

The issue thus becomes whether Pedrick had sufficient probable cause to arrest plaintiffs for any crime on January 24, 2007. Defendants assert that Pedrick had probable cause to arrest plaintiffs for obstructing governmental administration and resisting arrest.

### 1. **Obstructing Governmental Administration**

In the charging documents, Pedrick noted that Trey and Octavia committed the crime of obstructing governmental administration by repeatedly refusing to provide identification. See Raghavan Aff., Ex. D, Dkt. No. 52-4, 25, 32. In their motion papers, defendants argue

that Trey and Octavia obstructed governmental administration by interfering with Pedrick's questioning of Gregory.  <u>See</u> Defs.' Mem. of Law, Dkt. No. 51-7, 5.  Gregory's obstruction charge is based on his alleged interference with Octavia's arrest.

Under New York law, there are four elements to an obstructing governmental administration charge:  "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." <u>Cameron v. City of New York</u>, 598 F.3d 50, 68 (2d Cir. 2010) (internal quotation marks omitted); <u>see also</u> N.Y. PENAL LAW § 195.05 (McKinney 2011).  This statute has been interpreted to require "physical" force or interference; mere words are insufficient.  <u>People v. Case</u>, 42 N.Y.2d 98, 101–02 (N.Y. 1977).  "New York courts have further held that the official function being performed must be one that was authorized by law."  <u>Lennon v. Miller</u>, 66 F.3d 416, 424 (2d Cir. 1995) (internal quotation marks omitted).  The official function at issue here is Pedrick's traffic stop and his subsequent questioning of plaintiffs.

A police officer may legally stop a vehicle if the officer has reasonable suspicion that a traffic violation has been committed, even if that suspicion is based on a mistake of fact. <u>United States v. Stewart</u>, 551 F.3d 187, 193 (2d Cir. 2009).  Once a vehicle is lawfully stopped, a police officer is authorized to ask the occupants questions, request identification, order them out of the vehicle, and conduct a pat-down if the officer has reasonable suspicion that they may be armed.  <u>See</u> <u>Arizona v. Johnson</u>, 555 U.S. 323, 129 S. Ct. 781, 786–87 (2009); <u>Maryland v. Wilson</u>, 519 U.S. 408, 415, 117 S. Ct. 882, 886 (1997); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111, n.6, 98 S. Ct. 330, 333 (1977) (per curiam).  Because all occupants of a vehicle are seized at the point the car stopped, passengers as well as the driver have standing to challenge the constitutionality of the stop.  <u>Johnson</u>, 129 S. Ct. at

787; <u>Brendlin v. California</u>, 551 U.S. 249, 263, 127 S. Ct. 2400, 2410 (2007).  Further, "if a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle."  <u>Mollica v. Volker</u>, 229 F.3d 366, 369 (2d Cir. 2000).

Viewing the facts in the light most favorable to plaintiffs, there exists an issue of material fact as to whether Pedrick had reasonable suspicion to stop plaintiffs' vehicle or, therefore, probable cause to arrest plaintiffs for obstructing governmental administration.  Plaintiffs' maintain that one of the eleven taillight bulbs on the back of their car was dim.  Pedrick admittedly initiated the stop based solely on the taillight, and he had observed no other traffic violations.  New York law mandates that every vehicle manufactured after 1951 have "at least two lighted lamps on the rear, one on each side, which lamps shall display a red light visible from the rear for a distance of at least one thousand feet."  N.Y. VEH. & TRAF. LAW § 375(2)(a)(3) (McKinney 2011).  The fact that one of the eleven bulbs on the back of plaintiffs' car was dim does not constitute reasonable suspicion that this traffic law had been violated.  The car still had ten fully illuminated taillights.  Even assuming that the one deficient bulb was located on either end of the row of eleven bulbs, the bulb immediately next to it would arguably satisfy the statutory requirements.

If the initial traffic stop was invalid, Pedrick had no authority to demand identification from plaintiffs or order them out of the car.  There was thus no "official function" that plaintiffs could have interfered with, and they could not be arrested for their failure to comply with such commands.  <u>See</u>  <u>Williams v. City of Mount Vernon</u>, 428 F. Supp. 2d 146, 157 (S.D.N.Y. 2006) (because officers' initial stop of defendant was not supported by reasonable suspicion, they lacked probable cause to arrest him for obstructing lawful official conduct); <u>United States v. Fambo</u>, No. 05-CR-70S, 2006 WL 2990461, at *19 (W.D.N.Y. Oct. 19, 2006)

(officers lacked reasonable suspicion and were therefore not authorized to detain defendant, who "was free to walk away"); People v. Lupinacci, 191 A.D.2d 589, 589 (N.Y. App. Div. 2d Dep't 1993) (reversing defendant's conviction for obstructing governmental administration because the police officers did not have reasonable suspicion and, therefore, were not authorized to detain defendant).  Moreover, plaintiffs' refusal to produce identification, alone, could not have provided probable cause to arrest them for obstruction.  See Niles v. City of Oneida, No. 6:06-CV-1492, 2009 WL 799971, at *7 (N.D.N.Y. Mar. 25, 2009) (Suddaby, J.) ("[P]robable cause to arrest does not exist when a party refuses to comply with an order that is not lawful.").

Because there was no official function to interfere with, Pedrick lacked probable cause to arrest plaintiffs for obstructing governmental administration.  It follows that plaintiffs could not have been arrested for interfering with each others' unlawful arrests.  See Rivera v. Metakes, 216 F.3d 1073 (2d Cir. 2000) (Table; unpublished opinion found at 2000 WL 777954, at *3) ("[T]hat a genuine issue of material fact exists as to whether the Officers had probable cause to arrest [plaintiff] precludes a determination as a matter of law that [the other plaintiff] interfered with 'authorized' conduct.").

Even if the traffic stop was lawful, there remains an issue of material fact as to whether Trey and Octavia interfered with Pedrick's questioning of Gregory.  According to plaintiffs, they sat silently in the car while Pedrick spoke with Gregory and obtained his license and registration.  In fact, Trey and Octavia deny saying anything to Pedrick until he approached their vehicle the second time.[7]

---

[7] While Trey acknowledges openly accusing Pedrick of racial profiling, he maintains that these comments were made at the police station after his arrest, not during the traffic stop.

Neither could Gregory's actions have, as a matter of law, provided probable cause to arrest him for obstruction.  It is undisputed that Gregory provided his name, license, and registration when asked.  Moreover, Gregory admittedly exited the driver's side of his vehicle while Pedrick was struggling to handcuff and arrest Octavia on the passenger side.  Although he yelled to his children across the street and asked Pedrick why he was "manhandling" Octavia, Gregory claims that he remained on the driver's side of the vehicle and did not physically interfere with the arrest.  Deputy Prusky recalls that Gregory remained standing on "the driver side front of his vehicle" while he and Pedrick placed Octavia in a patrol car. Raghavan Aff., Ex. J, Dkt. No. 55-3, 13–14.  Pedrick asserts that Gregory walked towards him in a threatening manner while yelling and failed to comply with repeated orders to "calm down" and "step back."  Pedrick Dep. Tr. Part 2 at 25.  This presents and issue of material fact as to whether Pedrick possessed probable cause to arrest Gregory for obstruction of governmental administration.  Compare In re Kendell R., 71 A.D.3d 553, 554 (N.Y. App. Div. 1st Dep't 2010) (overturning obstruction conviction where defendant merely failed to disperse and became verbally abusive towards police), with People v. Romeo, 9 A.D.3d 744, 745 (N.Y. App. Div. 3d Dep't 2004) (upholding defendant's obstruction conviction where he "was belligerent, uncooperative and refused several direct requests that he keep away from the officers as they attempted to subdue his girlfriend").

Finally, defendants' argument that Pedrick was not involved in Gregory's arrest is unpersuasive.  Although Deputy Prusky physically placed the handcuffs on Gregory, Pedrick admits "[w]e were both there, he just happened to be the one that handcuffed him."  Pedrick Dep. Tr. Part 2 at 40.  Pedrick further explained that he had already used his two pairs of handcuffs on Trey and Octavia, so Deputy Prusky had to handcuff Gregory out of necessity.

It is undisputed that Pedrick signed and filed the documents charging Gregory with obstruction of governmental administration and resisting arrest. Pedrick also issued Gregory a citation for an inoperable taillight.

In sum, viewing the facts in the light most favorable to plaintiffs, there remains a genuine issue of material fact as to whether Pedrick had reasonable suspicion to initiate the traffic stop. Therefore, his subsequent interaction with plaintiffs was arguably unauthorized and not an "official function" that plaintiffs could legally be charged with obstructing. Consequently, Pedrick lacked probable cause to arrest plaintiffs for obstruction of governmental administration. Moreover, even if the traffic stop was legal, there remains an issue of material fact as to whether plaintiffs' conduct constituted probable cause to arrest them for obstruction.

## 2.  **Resisting Arrest**

Under New York law, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person." N.Y. PENAL LAW § 205.30 (McKinney 2011). There are thus two essential elements:  "(1) the person charged must have intentionally attempted to prevent the arrest of himself or someone else, and (2) the arrest he attempted to prevent must itself have been supported by a warrant or probable cause." Curry v. City of Syracuse, 316 F.3d 324, 336 (2d Cir. 2003).

As noted above, a genuine issue of material fact exists as to whether Pedrick had probable cause to arrest plaintiffs. Therefore, a similar issue of fact exists regarding the second element of the resisting arrest charges. See Niles, 2009 WL 799971, at *8 ("When an officer unlawfully contacts a person, that person is justified in reasonably resisting such

contact."); <u>People v. Branch</u>, 223 A.D.2d 882, 883 (N.Y. App. Div. 3d Dep't 1996) ("[A]bsent proof that the arresting officer had a warrant or probable cause to arrest defendant for the commission of some offense, a conviction [for resisting arrest] cannot stand." (internal quotation marks omitted)).

Accordingly, defendants' motion for summary judgment will be denied as to the false arrest claims.

### C. <u>Malicious Prosecution Claims</u>

Plaintiffs each assert a claim for malicious prosecution. Defendants argue that these claims must be dismissed because Pedrick had probable cause to arrest and bring criminal charges against plaintiffs, and because the charges were not dismissed in plaintiffs' favor. As explained above, a genuine issue of material fact exists as to whether Pedrick had probable cause to arrest plaintiffs. Therefore, defendants' only remaining argument for dismissal of these claims is that the charges were not terminated in plaintiffs' favor.

To establish a malicious prosecution claim, a plaintiff must show: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." <u>Droz v. McCadden</u>, 580 F.3d 106, 109 (2d Cir. 2009) (per curiam) (internal quotation marks omitted), <u>cert. denied</u>, 130 S. Ct. 1914 (2010).[8]

Regarding the favorable termination element, "[a]n affirmative demonstration of innocence is not required." <u>Rivas v. Suffolk Cnty.</u>, 326 F. Supp. 2d 355, 363 (E.D.N.Y.

---

[8] "The elements of . . . malicious prosecution under § 1983 are substantially the same as the elements under New York law." <u>Boyd v. City of New York</u>, 336 F.3d 72, 75 (2d Cir. 2003) (internal quotation marks omitted).

2004), remanded on other grounds, 2008 WL 45406 (2d Cir. 2008).  A plaintiff must only establish that "[t]he prosecution terminated in a manner not inconsistent with plaintiff's innocence."  Smith-Hunter v. Harvey, 95 N.Y.2d 191, 198 (N.Y. 2000).  A dismissal, even one "without prejudice" or "in the interest of justice," meets the requirements of the favorable termination element so long as it signals the end to a prosecution such that criminal charges cannot be brought again.  Id. at 196–97; see also Cantalino v. Danner, 96 N.Y.2d 391, 395 (N.Y. 2001).  Conversely, a dismissal that results from "a settlement, mercy or any misconduct by plaintiff" does not satisfy this element.  Smith-Hunter, 95 N.Y.2d at 198.  The trial court is required to state on the record its reasons for dismissing the criminal charges. N.Y. CRIM. PROC. LAW § 170.40(2) (McKinney 2011).

Unfortunately, the Village Justice did not provide any explanation for the dismissal of the charges against Gregory.  In a letter addressed to Gregory's attorney, the Village Justice merely noted that "[t]his Court dismisses the above charges against Gregory G. Wilson in the interest of justice."  Raghavan Aff., Ex. E, 2.  There is nothing further in the record to indicate exactly why the charges were dismissed.  Given these circumstances, it cannot be held, as a matter of law, that the dismissal of the criminal charges against Gregory was inconsistent with his innocence.

The record is similarly sparse as to why the charges against Octavia and Trey were dismissed.  In a letter to Octavia and Trey's attorney, the Village Justice wrote:

> This Court rules that the charge of resisting arrest filed against [Octavia and Trey] on 1/24/07 does not meet the requirements addressed by the Court of Appeals in People vs. Alejandro 70 N.Y.2d 133 (1987).  Further, this Court rules that the charge of obstructing governmental administration filed on the same date against [Octavia and Trey] does not meet the requirements set forth in CPL 100.40.

> Therefore this Court dismisses the charge of obstructing governmental administration and the charge of resisting arrest against [Octavia and Trey] without prejudice.

Id. at 1, 3.  This language fails to explain why the charges did not meet the requirements of case law and statute.  It is entirely possible that the facts of the case did not satisfy the requirements, thus counseling dismissal and indicating plaintiffs' innocence.  Defendants argue that the dismissal was instead due to facial errors in the charging documents and conclude that because the charges were dismissed "without prejudice" the prosecution could have refiled the charges.  However, the failure to timely refile the charges indicates the abandonment of the prosecution.[9]  See Cooperstein v. Procida, No. 00-CV-2642, 2001 WL 715831, at *6–7 (E.D.N.Y. June 4, 2001) (finding that a dismissal constituted favorable termination because the statute of limitations had run, barring a subsequent prosecution).

Given the lack of an explanation for the dismissal of the criminal charges against the plaintiffs, and viewing the evidence in the light most favorable to them, the criminal proceedings terminated in a manner not inconsistent with their innocence.  Moreover, there is nothing to suggest that the charges were dismissed by way of a compromise with the plaintiffs, out of mercy for them, or due to any misconduct by them.  Accordingly, defendants' motion for summary judgment will be denied as to the malicious prosecution claims.

---

[9]  "A prosecution for a misdemeanor must be commenced within two years after the commission thereof."  N.Y. CRIM. PROC. LAW § 30.10(2)(c) (McKinney's 2011).  Octavia and Trey allegedly committed their misdemeanor offenses on January 24, 2007.  The charges against them were dismissed on October 9, 2007.  Assuming the criminal proceedings were lawfully initiated, the last day charges could have been refiled was October 9, 2009.  See id. § 30.10(4)(b) (excluding from the statute of limitations calculation the period of time that a "lawfully commenced" proceeding is pending).  The prosecution decided not to refile charges, indicating that the dismissal ended the criminal proceedings against Octavia and Trey.

### D. **Excessive Force Claims**

Plaintiffs each assert an excessive force claim.  Defendants argue that any force employed on January 24, 2007, was reasonable and justified under the circumstances.

An officer's use of force violates the Fourth Amendment "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'"  Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989)).  While "not every push or shove . . . violates the Fourth Amendment, [courts] have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising."  Id. (internal quotation marks, citations, and alterations omitted).

When making this reasonableness determination, courts are to consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872.   An unreasonable use of force violates the Fourth Amendment even if it does not result in serious injury.  Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987).  Indeed, the Second Circuit has affirmed the award of nominal damages where no compensable injury can be proven.  See Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir. 1999).  However, the lack of injury or medical treatment may weigh on the mind of the fact finder when determining the reasonableness of the force applied.  Robison, 821 F.2d at 924.

Viewing the evidence in the light most favorable to the plaintiffs, there remains a genuine issue of material fact as to whether Pedrick used an unreasonable amount of force against Trey and Octavia in light of the circumstances he confronted.  Pedrick had pulled plaintiffs' car over for an alleged taillight malfunction and, as noted above, arguably lacked probable cause to make any arrests.  According to plaintiffs, he nonetheless threatened to pepper spray Trey, opened the back door of the vehicle, forcibly pulled him from the backseat, and placed him in handcuffs.  Plaintiffs also maintain that Pedrick grabbed Octavia around the waist from behind, attempted to force her to the ground by bending her knee, and struggled with her until she was handcuffed and placed in a patrol car.  Octavia alleges that during the arrest she sustained a knee injury, which ultimately required medical treatment.  Pedrick reportedly used this force simply because Trey and Octavia refused to provide identification.

Plaintiffs fail to establish a material issue of fact regarding Gregory's excessive force claim.  In his deposition, Gregory claims that two officers grabbed him from behind, handcuffed him, "dragged" him to a police car, and "slammed" him onto the hood.  Gregory Dep. Tr. at 77–80.  However, Gregory identifies these two officers as Officer Henry and "a sheriff's deputy"—neither of whom are defendants in this action.  Id. at 77.  Although Pedrick admits to being present when Deputy Prusky physically placed handcuffs on Gregory, there is nothing in the record to suggest Pedrick used any force whatsoever against Gregory.

Accordingly, defendants' motion for summary judgment will be denied as to Trey's and Octavia's excessive force claims but granted as to Gregory's excessive force claim.

### E. __Qualified Immunity__

Pedrick asserts that he is entitled to qualified immunity.  It is well-settled that "[q]ualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  Even if clearly established rights were violated, "the officers will nonetheless be entitled to qualified immunity if it was objectively reasonable for them to believe their acts did not violate those rights."  Id. (internal quotation marks omitted).  Immunity should be granted "'[i]f officers of reasonable competence could disagree' as to whether probable cause existed."  Id. (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).  If the material facts involved are undisputed, "the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court."  Id. at 368.  Conversely, if pertinent facts are disputed, "the factual questions must be resolved by the factfinder."  Id. (internal quotation marks omitted).

Here, the right to be free from warrantless arrest and prosecution without probable cause as well as the right to be free from the use of excessive force are clearly established.  See id. (noting that "the right not to be subjected to a warrantless arrest without probable cause" is clearly established); Calamia v. New York, 879 F.2d 1025, 1036 (2d Cir. 1989) ("The right of an individual not to be subjected to excessive force has long been clearly established.").  The issue thus becomes whether it was objectively reasonable for Pedrick to believe that his acts did not violate these rights.  This determination turns on the disputed material facts.  The lynchpin to a majority of the claims asserted—the legality of the traffic

stop—hinges on whether the state of plaintiffs' taillight on January 24, 2007, provided reasonable suspicion of a traffic violation.

Further, even if the stop was legal, the parties dispute what transpired after Pedrick approached the vehicle. If plaintiffs' version is taken as true, Gregory was fully compliant with Pedrick's inquiries and Octavia and Trey remained silent while Pedrick was questioning Gregory. Nonetheless, Pedrick demanded the passengers' identification, threatened to pepper spray Trey, dragged him out of the car, physically struggled with Octavia, injured her knee, placed plaintiffs under arrest, and filed charges against them without probable cause. It would be objectively unreasonable for Pedrick to believe such conduct did not violate plaintiffs' constitutional rights. If defendants' version of the facts are accepted, however, there was an odor of alcohol emanating from the car, Gregory provided evasive answers, and Octavia and Trey prevented Pedrick from conducting a routine inquiry into the circumstances and then refused to provide identification or exit the vehicle and physically resisted being detained. Under such circumstances, it may be objectively reasonable for Pedrick to believe his conduct did not violate any of plaintiffs' rights.

Given these disputed facts and entirely different versions of the events, it cannot be determined as a matter of law that Pedrick is entitled to qualified immunity at this stage of the litigation. After a jury determines the facts, the question of qualified immunity may then be resolved as a matter of law. See Zellner, 494 F.3d at 368 ("Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.").

### F. **Punitive Damages**

Defendants assert that plaintiffs should not be permitted to seek punitive damages. To permit a punitive damage jury instruction, "[a]ll that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Such an instruction is warranted where "plaintiffs have produced evidence that the defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others, or, in other words, when the plaintiffs have produced evidence of a positive element of conscious wrongdoing or malice." Cameron, 598 F.3d at 69 (internal quotation marks and alterations omitted). "[I]t is long-settled that the lack of probable cause may give rise to an inference of malice." Id. (internal quotation marks omitted).

Viewing the record in the light most favorable to plaintiffs, Pedrick pulled over their car because one of eleven taillight bulbs was dim. He then demanded identification from all occupants and ordered them out of the vehicle, despite Gregory's full cooperation and the passengers' silence. When Trey did not immediately exit the vehicle, Pedrick threatened to use pepper spray, opened his door, and forcibly removed him from the vehicle. Pedrick then physically struggled with Octavia, causing her injury. All of this took place directly across the street from plaintiffs' residence as their children watched. Plaintiffs were arrested, charged with criminal offenses without probable cause, and Gregory and Trey spent the night in jail. Plaintiffs also allege that Pedrick's actions were motivated by racial bias and that his assertion that he smelled alcohol coming from the car was concocted after the fact in an effort to justify his actions.

These facts are sufficient to allow a jury to consider an award of punitive damages. See id. (holding that a punitive damages instruction was warranted where plaintiffs alleged that the defendant officers knew they lacked probable cause to arrest and provided the district attorney with false information to support criminal charges).

### G. Expert Testimony

Finally, plaintiffs seek to have the testimony of a potential defense expert excluded from the trial.  Defendants have not responded to this request.

It is well-established that "the district court functions as the gatekeeper for expert testimony whether proffered at trial or in connection with a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citation omitted); see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596–97, 113 S. Ct. 2786, 2798–99 (1993).  Such testimony must be reliable and is properly excluded if it is "speculative or conjectural." Salvino, Inc., 542 F.3d at 311.

Defendants attached an affidavit from Richard Cox, current Chief of Police for the Village of Solvay, New York, to their motion for summary judgment.  Cox Aff., Dkt. No. 51-2.[10] However, defendants have not formally indicated that they will call Mr. Cox as an expert witness at trial, nor have they identified what his testimony would offer.  As such, it is premature to rule on the admissibility of the testimony of this potential witness.

Accordingly, plaintiffs' request to have Richard Cox's testimony precluded from the trial will be denied without prejudice.

---

[10]  Mr. Cox worked for the Onondaga County Sheriff's Department for twenty-four years and was the Coordinator of Training for the Central New York Police Academy from 1990–1996.

## IV.  **CONCLUSION**

Plaintiffs concede that the Village cannot be held liable, under repondeat superior, for the § 1983 claims asserted against Pedrick.  Viewing the evidence in the light most favorable to plaintiffs, there remains a genuine issue of material fact as to whether Pedrick had reasonable suspicion to initiate a traffic stop of plaintiffs' vehicle on January 24, 2007.  This issue of fact precludes a finding, as a matter of law, that Pedrick had probable cause to arrest plaintiffs or commence criminal proceedings against them.  Moreover, the disputed facts counsel against granting Pedrick summary judgment on the excessive force claims, permitting him to benefit from qualified immunity, or preventing the jury from considering punitive damages.

As a result of the above, it is

ORDERED that

1.  Defendants' motion for summary judgment is DENIED in part and GRANTED in part;

2.  The defendant Village of Canajoharie is DISMISSED;

3.  Plaintiff Gregory Wilson's excessive force claim against defendant Michael Pedrick is DISMISSED;

4.  The following § 1983 claims against defendant Michael Pedrick are NOT DISMISSED:  (1) all three plaintiffs' false arrest claims; (2) all three plaintiffs' malicious prosecution claims; (3) all three plaintiffs' invasion of privacy/unlawful seizure claims; and (4) Octavia Wilson's and Trey Wilson's excessive force claims;

5.  Defendant Michael Pedrick is not entitled to qualified immunity at this time;

6.  Plaintiffs will be permitted to seek punitive damages; and

7.  Plaintiffs' request to preclude the testimony of defendant's expert is DENIED without prejudice and can be renewed as the litigation proceeds to trial.

IT IS SO ORDERED.

_____
United States District Judge

Dated: September 30, 2011
      Utica, New York.


The trial in this matter will begin with jury selection on Monday, December 5, 2011, at 9:30 a.m. at the United States Courthouse, 10 Broad Street, Utica, New York.  All pre-trial paperwork must be filed on or before Friday, November 18, 2011, at 12:00 noon.